1

1  TOWN OF EAST HAMPTON: STATE OF NEW YORK
   JUSTICE COURT
2  ----------------------------------------x
   THE PEOPLE OF THE STATE OF NEW YORK,
3

4                        DOCKET NO:14010313

5

6        -against-

7

8  CUTHBERT, WILLIAM,

9                    DEFENDANT.
   ----------------------------------------x
10                        Justice Court
                          159 Pantigo Road
11                        East Hampton, NY
                          October 14, 2014
12                        9:30 a.m.

13  B e f o r e :

14        STEVEN TEKULSKY, Town Justice

15  A p p e a r a n c e s :
          THOMAS J. SPOTA
16        SUFFOLK COUNTY DISTRICT ATTORNEY
          North County Complex - Building 77
17        Veterans Memorial Highway
          Hauppauge, New York 11778
18        BY:  SEAN MCDONNELL
              Assistant District Attorney
19                  For the People

20  JOSEPH GIANINNI, ESQ
    P.O. BOX 1958
21  AMAGANSETT, NY, 11930-1958

22

                * JURY TRIAL *
23

24                      Gloria Rosante,
                        Court Reporter

25

1

2          THE COURT:  Mr. MacDonnell are the

3     People ready to proceed with the

4     presentation of evidence.

5          MR. MACDONNELL:  People are ready,

6     Your Honor.

7          THE COURT:  Call your first

8     witness.

9          MR. MACDONNELL:  Your Honor, at

10    this time the People call Officer

11    Frank Trotta of the East Hampton

12    Police Department.

13         THE COURT:  Officer Trotta, please

14    raise your right-hand.

15  O F F I C E R   F R A N K    T R O T T A, a witness called

16  on behalf of the People, was duly sworn by the Court and

17  testified as follows:

18         THE COURT:  All right.  Be seated

19    and in a loud, clear voice please

20    state your full name and your shield

21    number.

22    A     Officer Frank Trotta.  East

23  Hampton Town Police, shield number 195.

24         THE COURT:  All right, Mr.

25    MacDonnell.

1              MR. MACDONNELL:  Thank you, Your

2         Honor.

3    EXAMINATION

4    BY MR. MACDONNELL:

5         Q     Good afternoon, Officer?

6         A     Good afternoon.

7              THE COURT:  Please try to speak

8         into the microphone and keep your

9         voice up.

10        Q     By whom are your currently

11   employed?

12        A     East Hampton Town Police

13   Department.

14        Q     And for how long have you been

15   so employed?

16        A     Just a little over nine years.

17        Q     Were you a police officer

18   anywhere prior to becoming one in East

19   Hampton?

20        A     I was NYPD.

21        Q     For how long were you with the

22   NYPD?

23        A     Just a little over eight years.

24        Q     Could you please describe for

25   the jury what your general duties are as a

1   police officer?

2          A      Just basic patrol duties.

3   Sometimes emergency response.

4          Q      Could you please describe the

5   training you completed prior to becoming a

6   police officer?

7          A      I went to NYPD Police Academy

8   in 1997 and came over here and received

9   training that they give here in the East

10  Hampton Police Department.

11         Q      Did you receive training

12  specifically regarding defensive tactics?

13         A      Yes.   Every year we are

14  recertified.

15         Q      Could you please explain the

16  training you receive every year regarding

17  defensive tactics and what a defensive

18  tactic is for the jury?

19         A      It's a taught level of

20  restraint to combat a certain level of

21  resistance.

22         Q      And you are recertified or

23  retrained in this how often?

24         A      Every year.

25         Q      Now I would like to draw your

1    attention to January 23, 2014.  Were you

2    working on that day?

3          A     I was.

4          Q     What tour was it?

5          A     I was the day shift so 7 to 3.

6          Q     Seven am to three p.m. ?

7          A     7:15 a.m.  to 3:15 p.m.

8          Q     Were you driving a marked

9    vehicle that day?

10          A     I was.

11          Q     Were you in your regular marked

12    patrol vehicle?

13          A     I was not.

14          Q     Why weren't you in your regular

15    vehicle?

16          A     With the excessive snow

17    conditions and the icy roads they

18    recommended we use four wheel drive vehicles

19    what are most likely the marine patrol four

20    wheel drive truck.

21          Q     What was the vehicle that you

22    were driving that day?

23          A     It was a small Ford Ranger.

24          Q     Do you recall what the weather

25    conditions were on January 23rd?

1          A      It was sunny.  A little over a

2      certain degree, maybe like eighteen to

3      twenty degrees, and there was a lot of snow.

4          Q      Were you in uniform that day?

5          A      I was.

6          Q      Were you alone or with a

7      partner?

8          A      I was alone.

9          Q      What if anything happed that

10     day at 10:26 am on the date?

11         A      I was dispatched to a minor car

12     accident Acabonac Road and Abrahams path.

13         Q      Are both those roads in the

14     Town of East Hampton, County of Suffolk,

15     State of New York?

16         A      Yes.

17         Q      What if anything happened when

18     you were dispatched to that scene?

19         A      I responded to the call and I

20     started heading in that direction.  I was

21     probably like two miles away.  I was coming

22     from the south after 27 up towards Abrahams

23     Path where the accident occurred.

24         Q      What if anything did you

25     observe as you approached that intersection?

1       A       I came up to a line of traffic.

2   Probably five or six cars, maybe at the

3   most.  I can't recall how many but there was

4   a few and there was a delivery truck.

5   Biggest one on the line, and I couldn't see

6   any oncoming traffic so I put on the

7   emergency lights and proceeded in oncoming

8   traffic to see if I could get close enough

9   to the accident.

10      Q       You as you drove into oncoming

11  traffic did you observe anything else as you

12  approached the intersection?

13      A       There was an individual

14  standing there talking, ands you know, in a

15  high tone to the driver of the fuel truck

16  that was parked right behind the vehicle

17  that was hit.

18      Q       Do you see that individual that

19  was in the road having a discussion with the

20  driver of the fuel truck in the courtroom

21  today?

22      A       I do and he is sitting right

23  over there.

24          MR. MACDONNELL:  Your Honor, let

25      the record reflect that the witness

*lights* *high tone*

1       identified the Defendant.

2              THE COURT:  Yes the record should

3       reflect that Officer Trotta has

4       identified the Defendant.

5          Q     Officer Trotta, can you please

6  describe what the accident scene itself

7  looked like when you saw it?

8          A     It wasn't that bad.  There were

9  five lanes of cars behind it and I came

*minor accident*

10 along side and there was a car slightly into ?

11 a van.  It wasn't really anything where I

12 could say major.  I mean just a small minor

13 accident.

14         Q     What if anything did you do

15 after you drove into the oncoming traffic

16 and drove up to where the Defendant was in

17 the road?

18         A     I pulled up next to him and,

19 again I was in a marine patrol vehicle, and

20 rolled down the window and leaned over and

21 said, "sir, could you move your vehicle out

22 of the roadway so it doesn't get hit again."

23 The intersection was extremely icy that

24 morning so, he turned to me and said, "I am

*BS*

25 waiting for the fucking cops."  And I said,

1  "well, I am the police I am just in another

2  vehicle if you could just move it.  He

3  turned around to the driver of the fuel

4  truck and said, "Do you have a fucking

5  problem too?"  And I said, "Sir, just move

6  your vehicle to the side of the road and let

7  these people pass they have nothing to do

8  with this.  I then proceeded away.  I cant

9  go any faster than two miles per hour and in

10  a fit of rage he elbows the passenger side

11  mirror of the truck screaming, "You fucking

12  hit me, you asshole, now you are running

13  people over, what is your problem?"

14       Q    And after he struck the side of

15  you vehicle what did you then do?

16       A    I then leaned out the door, and

17  looked at the driver of the delivery truck

18  and said, "You can't go anywhere I need your

19  name."  And he is like (that guy you didn't

20  even hit him, he elbowed your mirror, you

21  weren't even close to him.)  I said, okay but

22  you can't anywhere I need your name.  He

23  stuck around and the other Officer took it

24  down.

25       Q    Were you able to ascertain the

1   name of that driver?

2        A      I was, Jerry Brockwell.

3        Q      After this happened what did

4   you do next?

5        A      The driver then proceeded to

6   the van and moved it out of the way and I

7   came up behind him.  I called for assistance

8   for an irate motorist to have another unit

9   respond.  I then got out of the truck and

10  now we are on the bend of the golf course

11  facing north on Acabonac Road.  Abrahams

12  Path is now behind us.  I got out of the car

13  ands so does he, and here he comes.

14       Q      When you say, "Here he comes,"

15  what do you mean by that?

16       A      He is not happy.

17       Q      Was he saying anything to you?

18       A      He was screaming at me, "You

19  fucking pig, you big fucking asshole, get

20  another cop here," and I was like, you need

21  to calm down it was only an accident, this

22  will be done in five minutes.  I'll take

23  care of it.  No it was, "Fuck you, I am not

24  listening to you, get the fuck away, I want

25  somebody else."  At that time he turned to

1   me and was like, "Fucking get somebody

2   else."  And he was coming, eh was extremely

3   close.  I grabbed one arm and I pushed him

4   back to the van and said you are under

5   arrest for disorderly conduct.

6         Q     I want to stop you right there.

7   Why did you push him back at that point?

8         A     He turned and said, "I told you

9   get another fucking cop," and he was coming

10  at me so I push him away.

11        Q     After you pushed him away what

12  did he do?

13        A     He came off the van and I

14  grabbed his left arm and I pushed him back

15  again and said he was under arrest for

16  disorderly conduct.  I put one cuff on and

17  he pushed off the van and began flailing.

18  At this time I spun him around and ended up

19  on the hood of the Ford Ranger.

20              THE COURT:  Was that the vehicle

21        you responded in, the Ford Ranger?

22        A     That was the vehicle from

23  Marine Patrol, my vehicle yes.

24        Q     So you know have him with his

25  chest and face on the hood of your vehicle?

1      A    Yes.

2      Q    And how many hands were

3  handcuffed at this point?

4      A    One.  Only the left at this

5  point.

6      Q    What was he doing while you

7  were attempting to place the other hand in

8  the handcuffs?

9      A    He was screaming, "You fucking

10  pig, get the fuck off me, leave me the fuck

11  alone," and I was able hold him down and to

12  grab his right arm and lock it in.

13      Q    Was he doing anything with his

14  arms as you were trying to put the other

15  handcuff on?

16      A    He was combative and wouldn't

17  let me put the other handcuff on.

18      Q    After you had the second

19  handcuff on what if anything happened at

20  that time?

21      A    The second one went on and I

22  held him down and said, "You really need to

23  calm down."  And then Officer Johnson pulled

24  up and started to come around the corner and

25  he approached from the right and shortly,

1 not even then seconds after I got the

2 handcuff on he started yelling and

3 screaming, "Get the fuck off of me, you

4 fucking asshole, you pigs, I am going to

5 have your job."

6          Q     And when Officer Johnson

7 arrived what if anything did you do at the

8 point?

9          A     Officer Johnson asked me what

10 was happening and I said I don't know he

11 won't stop and I am holding him down and he

12 is in cuffs and Officer Johnson and I held

13 him down by his shoulders and told him to

14 calm down and that he was under arrest.  He

15 said, "Fuck you, I am not listening to you,

16 fuck you guys, I hope your family gets

17 cancer and dies."  It just kept coming out

18 at this point.

19          Q     Did he calm down at all this

20 point?

21          A     He didn't and he was still

22 flailing on the hood of the car and at that

23 point Officer Johnson being the Defensive

24 Tactics Instructor turned to me and said,

25 "You know for our safety and he doesn't get

1   injured and for our safety so we don't get

2   injured, hes' doing down to the ground to

3   stop him from bouncing on the hood of the

4   car." And that is what we did.

5        Q    So you placed him on the

6   ground.  How did you place him on the

7   ground?

8        A    He just went down almost on his

9   side and on his chest to hold him down to

10  stop him from all the other stuff.

11       Q    When you placed him on the

12  ground did any other Officer's show up at

13  this point?

14       A    Officer Rantinella showed up a

15  couple minuted after that and we were

16  holding him and restraining him, and on

17  numerous occasions telling him to calm down,

18  and you have got to relax and he just didn't

19  want to hear any of it.

20       Q    As you were telling him to calm

21  down and relax, what was he doing?

22       A    He just kept flailing and we

23  actually turned him over and sat him up.

24       Q    Why did you sit him up?

25       A    It's an uncomfortable position

1  to be on your chest so we turned him over

2  and sat him upright and he sat with his legs

3  out.

4       Q     Officer, I know you said it was

5  cold that day what uniform were you wearing?

6       A     I was wearing my regular police

7  uniform.  Just turtleneck and long sleeve.

8  I don't usually wear a jacket.  I don't

9  really wear it unless it's really needed.

10      Q     Did you need a jacket at any

11 point during this day?

12      A     I did, it was cold out there.

13 At one point Officer Johnson was over the

14 top of the driver and he had his knee out so

15 the driver wouldn't flail backwards and fall

16 into the snow and he stood there and I went

17 back and retrieved Officer Johnson's jacket

18 as well as mine.  Officer Rantinella put his

19 jacket on it was -- yes it was cold.

20      Q     And at any point did anybody

21 offer the Defendant a jacket to wear?

22      A     There was a female that came

23 over with a jacket of the driver and we

24 tried to put it on him but, "Fuck you, I

25 don't want it."

1     Q    What was his response to the

2  offer of the jacket?

3     A    "Fuck you, I don't want it, get

4  it off me, don't touch me."

5     Q    How did you attempt to put the

6  jacket on him?

7     A    We just draped it over the top

8  of him to try and keep him warm because his

9  hands were in cuffs and there was no way to

10  put the jacket on.

11     Q    Did there come a time when you

12  attempted to transport him back to

13  headquarters?

14     A    I did, unfortunately at this

15  time, because of the snow and the heavy

16  weather conditions we were all driving

17  4-wheel drive vehicles and due to policy we

18  don't put people in handcuffs right next to

19  me in the pickup truck so one of the

20  officers had to go back to headquarters and

21  pick up a police car and slowly make his way

22  back to Acabonac.

23     Q    Can you describe the truck you

24  were driving -- it was only?

25     A    It's only two seats.  A little

1   extension.  It's a small Ford Ranger.  No

2   bigger than a small mini pickup truck.  I

3   had the old lights on top, the old noise

4   makers.

5        Q    Is the anyplace to place the

6   Defendant in the vehicle?

7        A    No, the back is loaded with

8   emergency gear and the passenger seat had my

9   duty bag and me.

10        Q    Who arrived in the transport

11   vehicle that day?

12        A    Officer Thomas Strong.

13        Q    And do you recall the vehicle

14   or the type of vehicle he arrived in?

15        A    He was in the an old Crown

16   Victoria marked unit.

17        Q    Is there any partition from the

18   front seat and the back seat?

19        A    There is a window.

20        Q    Were you able to place this

21   Defendant in the rear of that vehicle?

22        A    We were.

23        Q    Did you have any difficulties

24   in placing him in the back of the vehicle?

25        A    We did.

1    Q    Could you please describe for

2  the jury the issues you had in getting him

3  in the vehicle?

4    A    We asked him -- when the

5  vehicle arrived, one person would open the

6  back door, two of us would have lifted him

7  up and he went limp.  "This is bullshit," we

8  dragged him to the car and we got him in the

9  car and laid him face down, across the

10  backseat.  He is a rather big guy and it

11  took a bit to get him in.  We got him in

12  faced in, all the way to the passenger door

13  their and we attempted to close the door by

14  bending his legs and once doors closed we

15  heard tapping on the window.  Bump, bump.

16    Q    Based on hearing the tapping on

17  the window what if anything did you do?

18    A    The tapping on the window, we

19  were concerned the window would break or he

20  would kick a window out so we moved his legs

21  up and put a leg restraint around his ankles

22  which clips onto his handcuffs so you can't

23  tap on the motor vehicle.

24    Q    Did you then get into the car

25  with Officer Strong to transport the

1  Defendant back to the precinct?

2        A    I did not.  I actually followed

3  him back while he transported.

4        Q    Did you meet the vehicle at

5  headquarters in Wainscott?

6        A    I did.

7        Q    What was the Defendant's

8  demeanor when you got back to headquarters

9  with the Defendant?

10        A    It was the same way.  A lot of

11  ranting and raving.  I wasn't that close but

12  you know, when the Officer came around I

13  opened the door and we had to pull him out

14  again.  And then from that point on I don't

15  know when he went of cell.

16        Q    And Officer, what did you

17  subsequently arrest the Defendant for on

18  January 23?

19        A    I arrested him for disorderly

20  conduct.  I arrested him for resisting

21  arrest and I arrested him for the

22  harassment.

23        Q    And what was the basis for the

24  harassment charge against yourself?

25        A    At some point at the time when

1   I was going to put handcuffs on him while he

2   was flailing and Officer Johnson noticed

3   that after we subdued him there was blood

4   running down my hand.  I don't know where it

5   came from it was probably at the struggle.

6         Q      What was the basis for the

7   disorderly conduct charge?

8         A      The assessment at the scene

9   with the profanity and screaming, yelling.

10        Q      While dealing with the

11  Defendant back at headquarters did you have

12  an opportunity to learn the name of the

13  Defendant?

14        A      Yes.

15        Q      And how did you come to learn

16  the name of the Defendant?

17        A      Through his New York State

18  drivers license.

19        Q      What was the name that you were

20  able to determine from the drivers license?

21        A      William Cuthbert.

22        Q      Thank you Officer?

23           MR. MACDONNELL:  Your Honor, no

24        further questions at this time.

25           THE COURT:  All right.  Mr.

1       Gianinni.

2   CROSS EXAMINATION

3   BY MR. GIANNINI:

4       Q       Officer Trotta, can you hear

5   me?

6       A       I can.

7       Q       You testified on direct

8   examination that you got a call from

9   dispatch, right?

10       A       Yes.

11       Q       And do you recall what time you

12   got that call?

13       A       I want to say right around

14   10:30, 10:35.  I am not really sure exactly

15   when.  I just knew I had to go.

16       Q       Was this as a result, if you

17   know, as a result of a 911 call to dispatch?

18       A       I would assume.  I don't know

19   how else it would come through my radio.

20       Q       When you say, you assume, at

21   this point you don't know?

22       A       No, I don't know.

23       Q       You don't know?

24       A       No.

25       Q       And are you saying that you

1   never found out that was it was his

2   girlfriend Jana Bennett?

3          MR. MACDONNELL:  Objection.

4      Q    Did.you ever find out that it

5   was his girlfriend that made the 911 call?

6      A    No. I never found that out?

7      Q    Now you said that there was

8   excessive snow?

9      A    There was a lot of snow.

10     Q    It was bitter cold?

11     A    It was.

12     Q    You said it was like seven,

13  eight or nine degrees?

14     A    I would say it was a little

15  more than that, but it was cole.

16         THE COURT:  He actually said it

17      was seventeen or eighteen degrees.

18         Eighteen to twenty.

19     Q    You were responding to an

20  accident at the intersection of Abrahams

21  Path and Acabonac Way?

22     A    Acabonac Road, yes.

23     Q    Acabonac Road.  Were you by

24  yourself?

25     A    I was at the time, yes.

1      Q     And you said on direct

2  examination that you were approached on

3  Abrahams Path towards Acabonac Road?

4      A     Yes.

5      Q     And there was some vehicles --

6  there were some vehicles at the

7  intersection?

8      A     Yes.

9      Q     There was a white van at the

10  stop sign?

11      A     Yes.

12      Q     That was Mr. Colberts,

13  Colberts, Cuthberts van right?

14      A     At the time I couldn't assume

15  that until I got up close.

16      Q     You did find out that was his

17  van?

18      A     Later on, yes.

19      Q     Behind that van there was an

20  automobile right?

21      A     There was a delivery truck.

22      Q     There wasn't a car behind it?

23      A     I can't recall that.  Not that

24  I know.

25      Q     When you say, "You can't

1   recall," is that your opinion?

2        A     Yes, my opinion at the time.

3        Q     So you saw a delivery truck you

4   are saying behind the white van?

5        A     Right.

6        Q     Did you have an conversation

7   with the person driving the delivery truck

8   before you spoke to Mr. Cuthbert?

9        A     No.

10        Q     Did you know the driver of the

11   truck?

12        A     I did not.

13        Q     Now you said that you told Mr.

14   Cuthbert to move his van, right?

15        A     Right.

16        Q     You were in your vehicle when

17   you told him?

18        A     I was, right next to him.

19        Q     You were on the drivers side?

20        A     Right.

21        Q     So did you roll down the window

22   and told him to move van.

23        A     I did.

24        Q     So you weren't right next too

25   him?

```
1          A     I was to right next tor him.

2          Q     Officer, you are driving.

3          A     Oh, okay.  Yes.

4          Q     He was on the passenger side?

5          A     I was three feet away there was

6   nobody in the passenger side seat.

7          Q     He was on the passenger side of

8   your car.

9          A     He was.

10         Q     And he was in the street?

11         A     He was.

12         Q     And you said that came a time

13  when he was walking back to his white van to

14  move it?

15         A     Right.

16         Q     And that you started to drive?

17         A     Right, I started to move up.

18         Q     And you drove right past him?

19         A     I started to drive as he was

20  walking next to the vehicle, yes.

21         Q     And so you were very close to

22  him?

23         A     Absolutely.

24         Q     And did you hear him -- did he

25  slam his left of right hand against your
```

1  vehicle as you were passing by?

2         A      I think it was his left elbow

3  and the mirror of my truck.

4         Q      You are saying that he

5  assaulted your truck?

6         A      If you want to call it assault

7  or maybe elbow to the mirror absolutely.

8         Q      You didn't hit him?

9         A      I didn't hit him.  No, sir.

10         Q      You didn't hit him?

11         A      I wasn't out of the car yet.

12             THE COURT:  One at a time guys.

13        Next question.

14         Q      Now after he supposedly hit

15  your vehicle did he get in his vehicle?

16         A      He did.

17         Q      And did he drive it around

18  Acabonac Road like you told him to do?

19         A      He did.

20         Q      Did he park it?

21         A      He did.

22         Q      So he was actually, at the

23  point, compliant with your commands?

24         A      At that point.

25         Q      Yes?

```
1          A    At that point, yes.

2          Q    And at that point did he curse

3    at you at all?

4          A    Yes, numerous times.

5          Q    Excuse me?

6          A    Numerous times already.

7          Q    But he did move his vehicle?

8          A    But he did move his vehicle.

9          Q    So he obeyed you?

10         A    He obeyed, yes.

11         Q    And after he moved the van over

12   to Acabonac Way where were you parked?

13   Right in front of him or behind?

14         A    Right behind him to deter

15   traffic.

16         Q    Did you pull in first and he

17   went around you or you pulled in first and

18   --

19         A    I can't -- I can't -- We just

20   ended up behind each other.

21         Q    You don't remember to pulling

22   in first?

23         A    No, I don't remember that.  I

24   can't recall that.  I just know we ended up

25   with his van was in front of my truck.
```

1      Q     Did there come a time when he
2   came out of the van?
3      A     Yes.
4      Q     How far away from him were you
5   at the time?
6      A     In the car or personally?
7      Q     Well you were sitting in your
8   car how far away.
9      A     Probably like three or four
10   feet.  Yes, I am in the car and his van is
11   about three feet.
12      Q     He comes out of his van?
13      A     Right.
14      Q     You are parked behind him?
15      A     Right.
16      Q     Your sitting in your car,
17   right?
18      A     Yes, right.
19      Q     That can't be three feet?
20      A     Oh no.  It would be more than
21   that, but I exited my vehicle and he exited
22   his so we were out at the same time.
23      Q     So he was maybe twenty feet
24   away at that time?
25      A     I would say that is excessive.

1  It was not that far.

2  Q   Fifteen feet?

3  A   Okay.  Yes, ten feet, if.

4  Q   Did you get out of your car at

5  that time?

6  A   Absolutely.

7  Q   Your were driving an SUV,

8  right?

9  A   I was driving a pickup truck.

10  Q   That's right a small pickup

11  truck.  And you started walking towards him?

12  A   I did.

13  Q   And he was walking towards you?

14  A   Yes.

15  Q   And did he say to you, "Do you

16  realize that you hit me?"

17  A   No.

18  Q   He never said that?

19  A   No, he said "Fuck you, you

20  fucking pig, get somebody else here, I am

21  not talking to you."

22  Q   When he said that to you, "Get

23  somebody else here," what did you think that

24  he meant?

25  A   He kept saying, "Get another

1    Officer here, I'm not fucking talking to

2    you."  There was one already on the way.

3        Q    Did you think he wanted a

4    superior Officer like a Sargent when he said

5    that?

6        A    No, he asked for somebody else

7    besides me.  He didn't rectify that.

8        Q    Now you made out a police

9    report regarding to this case, right?

10       A    I did.

11       Q    One of those reports is called

12   the narrative, right?

13       A    Right.

14       Q    Did you bring that with you

15   today?

16       A    I did but I don't have it with

17   me.

18            MR. MACDONNELL:  Judge, may I

19       approach the witness with a copy of

20       his narrative.

21            THE COURT:  You may.

22            (Wherein the Prosecutor handed the

23       Narrative to the Officer.)

24       Q    All right.  For the record we

25   will have that marked as Defense Exhibit A

1  for identification?

2          (The above-referred to Narrative

3      was marked as Defendant's Exhibit A

4      for identification, as of this date.)

5      Q    Is that a fair and accurate

6  copy of the narrative marked as Defendant's

7  Exhibit A for identification.

8          THE COURT:  For identification

9      only at this point.  We don't know

10      what it says and we may never know but

11      it is marked for identification.

12      Q    Officer Trotta?

13      A    Yes, sir.

14      Q    Is that the narrative we have

15  been talking about?

16      A    Yes, sir I believe so.

17      Q    You believe so or is it?

18      A    It is.

19      Q    Was that narrative based on

20  your recollection of the incident, of the

21  events?

22      A    Yes.

23      Q    Did you sign is this document?

24      A    I did.

25      Q    Is it true and accurate?

1          A      As accurate as I can get it,

2   yes.

3          Q      Now there is a part about half

4   way down the paragraph where you relay how

5   you arrested him.  It starts with -- lets

6   see -- Driver Defendant exited his vehicle

7   in a confrontational manner --

8               THE COURT:  It's not in evidence

9       so.

10              MR. GIANNINI:  I know.

11              THE COURT:  You want to tell him

12       what line it starts with and then you

13       can ask him questions about it.

14         Q      In this narrative, your

15   narrative does it say or did he --

16   withdrawn.

17              Does it say that he existed the

18   vehicle in a confrontational manner?

19         A      Yes, within inches --

20         Q      He got within inches of your

21   face?

22         A      Yes.

23         Q      And he said to you, "Fuck you,

24   fucking pig, I'm not listening to you,

25   fucking pig, get another officer here, you

```
 1   asshole."  And then you placed him under
 2   arrest according to this?
 3         A     Yes.
 4         Q     So he came over to you, you are
 5   saying?
 6         A     Right.
 7         Q     Got right in your face?
 8         A     Right.
 9         Q     And you placed him under
10   arrest?
11         A     Yes.
12         Q     For what?
13         A     Disorderly conduct.
14         Q     Now did a crowd assemble around
15   this incident?
16         A     Just motorists I believe there
17   was.
18         Q     Did he cause a public nuisance,
19   did he bother the public, was there a public
20   nuisance by him?
21         A     Not that I know of, no.
22         Q     Now you did an arrest report
23   too?
24         A     I did.
25         Q     Okay.  We will have that marked
```

no public nuisance

1          A      He was.

2          Q      And he was a -- well lets go

3   back.   You said you put him over the hood of

4   your vehicle?

5          A      Yes, trying to get him

6   handcuffed.

7          Q      So just so make this clear you

8   grabbed him, I think you said on direct

9   examination you grabbed his right arm first?

10         A      Left first.

11         Q      And then you swung him onto the

12  hood of vehicle?

13         A      Yes, sir.  He came around and

14  right on the hood of the truck.

15         Q      And then you grabbed his?

16         A      Right arm and attempted to --

17         Q      At all times he was on the hood

18  of your vehicle?

19         A      Yes, sir.  Flailing and

20  yelling.

21         Q      How much do you weigh?

22         A      I weigh a hundred and fifty two

23  pounds.

24         Q      Would you agree that Mr.

25  Cuthbert is bigger than you?

1    as Defendants Exhibit B.

2              THE COURT:  If You have one.

3              MR. MACDONNELL:  Judge I gave him

4         the entire six pages arrest report.

5              MR. GIANNINI:  Lets do just page 2

6         of 6.

7              (The above-referred to Page 2 of 6

8         of the Arrest Report was marked as

9         Defendant's Exhibit B for

10        identification, as of this date.)

11        Q    Just take a look at what we

12   have marked as Defendant's Exhibit B for

13   identification only.  That is page two of

14   the arrest report, right?

15        A    It is.

16        Q    And on the page there is a

17   portion that says, "Condition of Arrest,"

18   right?

19        A    Yes.

20        Q    And what did you check off?

21        A    Apparently normal.

22        Q    And there was also, on that

23   page a place to indicate what the subject

24   was wearing, what was marked off?

25        A    Black shirt and blue jeans.

1    Q    And um Officer?

2    A    Yes.

3    Q    You said that you called for

4    assistance while at the scene?

5    A    Right.

6    Q    Was William Cuthbert in his

7    vehicle when you called for assistance?

8    A    No, he was walking back to move

9    the van.

10   Q    He was walking towards you?

11   A    He was walking back to the van.

12   Prior to him elbowing the mirror I called

13   for assistance for an irate motorist?

14   Q    Hold on.  You mean he was

15   walking back to his van to move it?

16   A    Yes.

17   Q    He did move it?

18   A    Yes, I called for assistance --

19   Q    You called for assistance

20   before he got in his van that first time?

21   A    Absolutely.

22   Q    Now you said there came a time

23   that you handcuffed him?

24   A    Yes.

25   Q    Did you handcuff him to the

1   front?

2          A     No.

3          Q     Did you handcuff him to the

4   rear?

5          A     To the rear absolutely.

6          Q     While you were handcuffing him

7   where there any other Officers present?

8          A     Not at that time, no.

9          Q     Now so you handcuffed him by

10  yourself?

11         A     Yes.

12         Q     And can you show the jury how

13  you handcuffed him to the rear what position

14  his arms were in?

15         A     I don't remember.  I have no

16  recollection.  When I take the cuff out one

17  goes long ways and I grab the hand and put a

18  cuff on it and the other one comes if I can

19  get it comes back around and whichever way

20  that falls to subdue the subject that is

21  cuffed.

22         Q     Can you stand up and show us

23  what you are doing?

24               (The Officer then began to show

25         how he handcuffs a subject.)

1        A      One arms comes around and the

2   cuffs are on the right those come out, they

3   go on and they go on.  I have to retrieve

4   the other arm and that goes back around

5   whichever way the cuff goes on.  I have no

6   idea which way those went on.

7        Q      You don't -- so what you are

8   saying is that you the don't know if he was

9   cuffed in a parallel manner like I am

10  indicating right now with my hands?

11       A      No I am not sure.

12       Q      Or if he was cuffed with his

13  hands on top of on another?

14       A      I can tell you he is not very

15  agile.  This is a big man and trying to get

16  his hand behind him but at the time I was

17  just trying to cuff him.

18       Q      So it could have been one hand

19  on top of the other?

20       A      Could have went this way or

21  this way both ways, whichever way.

22           THE COURT:  Just for the record

23       Mr. Giannini was showing and indicting

24       once again a position where his hands

25       were on top of the other and Officer

1     Trotta could be any number of

2     combinations one on top of the other

3     reverse one on top of the other, side

4     by side or even the palms facing each

5     other, is that correct?

6     A    That is correct.

7     THE COURT:  Thank you.

8     Q    The point is that it could have

9 been one on top of the other?

10    A    It absolutely could have been.

11    Q    You have handcuffed people that

12 way before?

13    A    Numerous times.

14    Q    Excuse me?

15    A    Numerous times.

16    Q    Now -- how long were you at the

17 scene with Mr. Cuthbert before the first

18 Officer other than you arrived, before

19 another Officer arrived?

20    A    I would probably say eight, ten

21 minutes maybe.

22    Q    Who was that?

23    A    Officer Barry Johnson.

24    Q    And when he arrived on the

25 scene Mr. Cuthbert was already handcuffed?

1        A      He was.

2        Q      And he was a -- well lets go

3    back.  You said you put him over the hood of

4    your vehicle?

5        A      Yes, trying to get him

6    handcuffed.

7        Q      So just so make this clear you

8    grabbed him, I think you said on direct

9    examination you grabbed his right arm first?

10       A      Left first.

11       Q      And then you swung him onto the

12   hood of vehicle?

13       A      Yes, sir.  He came around and

14   right on the hood of the truck.

15       Q      And then you grabbed his?

16       A      Right arm and attempted to --

17       Q      At all times he was on the hood

18   of your vehicle?

19       A      Yes, sir.  Flailing and

20   yelling.

21       Q      How much do you weigh?

22       A      I weigh a hundred and fifty two

23   pounds.

24       Q      Would you agree that Mr.

25   Cuthbert is bigger than you?

1          A      Absolutely.   That is the reason

2    I placed him on the hood of the pickup.

3          Q      Then Officer Barry arrived?

4          A      Yes.

5          Q      And you were both outside of

6    the pickup truck?

7          A      Yes.

8          Q      And what was the first thing

9    Officer Barry does?

10         A      He comes over and asks me

11   what's happening and I told him that this

12   gentleman, this guy wouldn't stop, he just

13   keeps yelling and screaming and he says,

14   "Great another cop."  "Sir, calm down."

15         Q      But he's cuffed now?

16         A      He is cuffed and flailing on

17   the hood of the car in an irate manner.

18         Q      Flailing his legs you mean?

19         A      Failing with his body in an

20   irate manner.

21         Q      He was moving up and down.

22         A      Absolutely.  Clearly irate.

23         Q      Could it be that he was in

24   pain?

25         A      He didn't say pain but he was

```
 1  irate.
 2          Q    Could it be that he was in
 3  pain?
 4          A    Yes.
 5          Q    From being handcuffed with his
 6  hands --
 7          A    He never said anything --
 8               THE COURT:  Wait until he is
 9        finished his question.  Continue.
10          Q    Could it be that he was in
11  pain?
12          A    It could habe been but he never
13  said anything about it.
14          Q    He didn't tell you he was in
15  pain?
16          A    No.
17          Q    That it was hurting?
18          A    No.
19          Q    To loosen cuffs?
20          A    No.
21          Q    Never said anything like that?
22          A    Not at that time, no.
23          Q    Did he ever say that?
24          A    Not that I can recall, no.
25          Q    Now when Officer Barry arrived
```

1  did you place Mr. Cuthbert in one of the

2  vehicles?

3        A     We did.  That was about fifteen

4  minutes after we had called for a transport

5  unit, a police car with a caged unit.

6        Q     Are you saying you kept him

7  outdoors until an additional vehicle arrived

8  besides Officer Barry?

9        A     Yes.

10       Q     Didn't you say there was an

11 Officer Rantinella that also responded?

12       A     Yes, sir.

13       Q     How long were you at the scene

14 when Officer Rantinella responded?

15       A     Within the ten minutes, shortly

16 after.

17       Q     Do you have anything to

18 indicate how long you were at the scene that

19 day?

20       A     Just the record -- just the

21 record would show.

22       Q     What does it show, how long

23 were you there?

24       A     It shows, I don't have the

25 exact time I arrived but it does have the

1    time that he was transported at 10:56.

2          Q    Officer, Officer, I want to

3    know if you need something to refresh your

4    recollection of when you arrived and when

5    you actually put him in a vehicle for

6    transportation?

7          A    Oh, that I have no idea.   I

8    can't recall that.

9          Q    Could it have been thirty

10   minutes?

11         A    Absolutely.

12         Q    Could it have been 40 minutes?

13         A    I would say more thirty because

14   I arrived at 10:30 and he was taken away at

15   10:56 so almost a half an hour.

16         Q    You said on direct examination

17   that when you brought him over to the

18   vehicle for transportation you had to drag

19   him over?

20         A    Yes.

21         Q    Did you drag him with someone

22   else?

23         A    I did.

24         Q    Who was that?

25         A    It was Officer Johnson.

1       Q       So again he was outside?

2       A       Right.

3       Q       And you dragged him over to

4   this vehicle?

5       A       Right.

6       Q       And you put him in face down?

7       A       Right.

8       Q       In the back of the vehicle?

9       A       Yes.

10      Q       And at also time he was cuffed?

11      A       Yes.

12      Q       To the rear?

13      A       Yes.

14      Q       Was he in pain?

15      A       Not that I know of.  He was

16   yelling.

17      Q       He was yelling, he was in pain?

18      A       That I can't recall.  I don't

19   know about that.

20      Q       When you say, "You can't

21   recall," are you saying that he might have

22   been saying I am in pain, loosen these

23   cuffs?

24      A       No, at the time he was refusing

25   to walk and was caught under his arms and

1  dragged to the back of the car because he

2  was in custody.  He was placed in the back

3  of the vehicle and then his legs were spread

4  wide open so he wouldn't enter.  So they had

5  to be closed and had to be pushed in.  At

6  that time I went around to the drivers side

7  passenger door and pulled him through.

8        Q      There was, like you said, about

9  a half hour from the time you arrived until

10  you put him in the vehicle for

11  transportation?

12        A      Right.

13        Q      Did there come a time when you

14  had him sitting on the side of the road in

15  the snow?

16        A      Yes, sir.

17        Q      So he was actually sitting on

18  his ass in the snow?

19        A      Yes, for his own safety.

20        Q      Not in a police car?

21        A      No.  There was no other police

22  cars there.  We all had SUV's.

23        Q      And you say it was like bitter

24  cold?

25        A      It was.  He was offered a

1   jacket which he refused.

2          Q      Did you ever turn him on his

3   face while he was sitting in the snow?

4          A      No.

5          Q      And you never put him face

6   down?

7          A      Yes, he went chest down after

8   he was un compliant on the hood of the

9   truck.  With safety for himself and safety

10  for the Officers if someone continues to

11  flail the next spot is from a standing

12  position down to the ground level.  There is

13  no chance of him falling off the car or

14  hurting himself?

15         Q      So there was a time that they

16  had him face down in the ice and snow?

17         A      Yes.

18         Q      Was Officer Barry present?

19         A      He was.

20         Q      All right.  Did you ever see

21  Officer Barry get on top of him while he was

22  face down and put his knee in his back?

23         A      No, I didn't see that no.

24         Q      By the way, when was the last

25  time you discussed this case before you took

1   the stand with Officer Barry?

2        A     We have talking about it's now

3   for the last couple of days.

4        Q     You have been talking about

5   this case?

6        A     Yes, sir.   It was a concern?

7        Q     So when was the last time?

8        A     Today.

9        Q     Where was that?

10       A     Right in the back.

11       Q     You mean of courthouse?

12       A     Yes.

13       Q     He is here?

14       A     Yes.

15       Q     What about Officer Rantinelli,

16  when was the last time you talked about the

17  case with him before you took the stand?

18       A     I want to say Monday.

19       Q     Where was that?

20       A     Headquarters.

21       Q     And police Officer Thomas

22  Strong, the last time you discussed the case

23  with him before you took the stand?

24       A     He was also Monday.

25       Q     Monday?

1          A      Monday, the one that just

2    passed, yesterday.

3          Q      Where?

4          A      At headquarters.

5          Q      When was the last time you

6    discussed the case with ADA MacDonnell

7    before you took the stand today?

8          A      Today.

9          Q      Before you took the stand?

10         A      Yes.

11         Q      Was Officer Johnson there?

12         A      He was.

13         Q      Officer Rantinella?

14         A      No?

15         Q      Officer Strong?

16         A      No.

17         Q      Now when you arrived at the

18   scene you were there to investigate an

19   accident, right?

20         A      I was.

21         Q      Did you take any photos?

22         A      No.

23         Q      Did you take a statement from

24   the driver of the of the other vehicle Luz

25   Torres?

1          A      No.

2          Q      Do you know if anyone ever

3    spoke to her from January 23, 2014 until

4    today?

5          A      Not that I am aware of, no.

6    No.

7          Q      So you are sure you didn't

8    speak to her?

9          A      Yes.

10         Q      And Officer Barry didn't speak

11   to her?

12              THE COURT:  Just for the record

13        it's Officer Barry Johnson.

14         Q      Barry Johnson.  I am sorry.

15              Do you know that Officer Barry

16   Johnson did not take a statement from her,

17   right?

18         A      I am not aware of that, no.

19         Q      You haven't seen any statement?

20         A      No.

21         Q      It's the same thing with

22   Officer Thomas Strong, no statement?

23         A      No.

24         Q      Did there come a time that any

25   of the Officer's told the driver of the

1    other vehicle to leave the scene?

2           A    Not that I am aware of.

3           Q    Did she leave the scene?

4           A    She must have after the

5    transport.  I didn't stay in touch.

6           Q    You said in direct examination

7    that you did training right?

8           A    I did.

9           Q    You get training to conduct

10   investigations on accident scenes?

11          A    I do.

12          Q    You did do an accident report?

13          A    I did.

14          Q    Did you come to a conclusion

15   who was a fault?

16          A    I did.

17          Q    And who was that?

18          A    I am unaware, I put generally.

19   I don't come to a conclusion whether it was

20   someone's fault I just state what the

21   drivers had stated.

22          Q    And was it clear based on your

23   investigation that Mr. Cuthbert was not at

24   fault?

25          A    Yes.

1     Q     The other driver was at fault?

2     A     She slid --

3     Q     Did you inspect her vehicle at

4  all?

5     A     I did.  I glanced at it when we

6  were parking the van.

7     Q     Do you recall what she was

8  driving?

9     A     I think it was a red vehicle.

10  I don't recall what kind of vehicle it was.

11     Q     Do you recall if it was an old

12  vehicle or a new vehicle?

13     A     I can't recall.

14     Q     Can you recall if the tires --

15          THE COURT:  Mr. Giannini, you must

16       let him finish his answers so you can

17       ask your next question.

18     Q     Do you recall if he tires were

19  bald?

20     A     I don't recall that, no.

21     Q     Do you have of camera in your

22  car when you go out to do investigations?

23     A     I don't.  No, sir.

24     Q     You have cameras at

25  headquarters?

1        A      The Sargent vehicle has a

2   camera yes.

3        Q      And you use them at times to

4   take photos of accident scenes and crime

5   scenes?

6        A      Yes, at times.

7        Q      But that day you didn't have

8   any?

9        A      No, I was not in my regular

10  patrol vehicle.

11       Q      What about video cameras?  Do

12  you have video cameras at headquarters?

13       A      We do have video cameras in the

14  cell area a headquarters.

15       Q      Is there any video of the Mr.

16  Cuthbert in his cell?

17       A      Not that I am aware of.  I

18  don't know.

19       Q      Withdrawn.

20              He is transported back to

21  headquarters, right?

22       A      Right.

23       Q      And did you go back to

24  headquarters?

25       A      I did.

1      Q      And were you there when he
2  arrived?

3      A      I was.

4      Q      You are the arresting Officer,
5  right?

6      A      I am.

7      Q      He was still cuffed?

8      A      He was.

9      Q      And what if anything did you do
10 with him when he first got to headquarters?

11     A      What routine we have is to help
12 him tor exit the vehicle.

13     Q      Was he put in a cell.

14     A      I think he was put behind the
15 glass for processing at first.

16     Q      When you last saw him was he
17 still handcuffed?

18     A      Absolutely.

19     Q      Do you know how long he
20 remained handcuffed at headquarters that
21 day?

22     A      No, I don't.

23     Q      Could it have been several
24 hours?

25     A      It could have been but it's

1    unlikely.

2           Q      Now, if you know, or isn't it
3    true that while he was at headquarters an
4    Officer took photographs of his wrists and
5    hands?

6           A      I believe there were some.

7           Q      What do you mean?

8           A      I think the Sargent took those
9    but I am not sure.

10          Q      This is your case right?

11          A      Absolutely.

12          Q      And you don't know whether or
13   not your Sargent took photos or not?

14          A      The photos were never enclosed.
15   There are photos of him.

16          Q      How do you know that?

17          A      I saw them the other day.

18          Q      You saw them when?

19          A      The other day.

20          Q      All right.  I am going to hand
21   up to you -- I guess you can have this
22   marked as Defendants Exhibit C for
23   identification.

24                 THE COURT:  These are the photos
25          you showed us before Mr. Giannini.

1           MR. GIANNINI:  No, no these are

2       other things.

3           (The above-referred to PHOTOS (6)

4       were marked as Defendant's Exhibits

5       C-H for identification, as of this

6       date.)

7       Q       Officer Trotta, we just handed

8    to you -- you have seen these photos?

9       A       I have.

10      Q       And where was that?

11      A       During the discussion with the

12    DA.

13      Q       When was that?

14      A       I want to say Monday,

15    yesterday, Monday.

16      Q       But you knew back on January

17    23, 2014, that Sargent Claffin had taken

18    some photos?

19      A       I didn't know until yesterday

20    that he took photos.  I processed the

21    accident, the arrest and then I went home.

22    Whatever else that happened after that, that

23    was done by somebody else.  Sargent Claffin.

24      Q       But again, this was your case.

25      A       Absolutely.

1        Q        When was the last time you

2    talked to Sargent Claffin before you took

3    the stand today?

4        A        About this case?

5        Q        About this case?

6        A        About this case i have not.

7        Q        Now am I right for saying that

8    those photographs were taken on January 23,

9    2014?

10       A        I would say yes, with the cover

11   sheet but there is no physical date on this

12   so.

13       Q        The cover sheet says January

14   23, 2014?

15       A        Yes.

16       Q        And he cover sheet came with

17   the photos?

18       A        Okay.

19       Q        And do you know if that is a

20   fair and accurate representation of how his

21   wrist appeared on that date and that time?

22       A        At that time when the photos

23   were taken?  Like I said, I don't know I

24   wasn't there.  I think it could have been

25   but I am unaware what they looked like after

1  the photos were taken and I don't know.  He

2  was taken to a cell and I went to the other

3  room to process so --

4        Q    Do you know if they are a fair

5  and accurate representation?

6        A    No, I don't know no.  Are there

7  red marks?  Absolutely, sir.

8            THE COURT:  You have an answer to

9       the question Mr. Giannini.  You are

10       going to ask another.

11            MR. GIANNINI:  Yes.  May I have

12       thirty seconds Your Honor?

13            THE COURT:  Sure.

14       (Whereupon, a short recess was

15                 taken.)

16       Q    If you know Officer Trotta, how

17  long did you have Mr. Cuthbert on his face

18  in the snow at the time how many minutes?

19       A    I would say not even a minute.

20  He was subdued in not even a minute because

21  he was turned on his side and then sat down

22  on his rear end.

23       Q    When you say, "He was subdued,"

24  he was taken off the hood of your car.

25       A    Yes.

1        Q     With the assistance of Officer
2   Johnson?

3        A     Yes, sir.

4        Q     Okay.  Is it true that while
5   you were at the scene Mr. Cuthbert's
6   girlfriend responded to the scene, Jana
7   Bennett?

8        A     Somebody came and I believe
9   that was her.  He knew who she was.

10       Q     An you describe her as she was
11  there?

12       A     She was female.

13       Q     Can you describe her any more
14  than that?

15       A     Not at this time, no.

16       Q     And did she come over to you?

17       A     She did.

18       Q     Did Officer Johnson warn her
19  away or tell her to stay back?

20       A     Yes, absolutely.

21       Q     Did she stay back?

22       A     She did.

23       Q     Did she take out her phone?

24       A     She had a phone in her hands
25  yes, sir.

1        Q      Did you see her pretending to

2   take some photograph?

3        A      He just had the phone out I

4   don't know if she took any photographs, sir.

5        Q      What are we up to?  Would you

6   look at, after we have this marked as

7   Defendant's I for identification only?

8           (The above-referred to Photo was

9        marked as Defendant's Exhibit I for

10       identification, as of this date.)

11          THE COURT:  We are ready when you

12       are Mr. Giannini.

13       Q      Did you take a look at it?

14       A      Yes, sir.

15       Q      Can you tell us what it is?

16       A      It's Officer Johnson standing

17   over Mr. Cuthbert.

18       Q      Is that the date, time and

19   place that we are talking about?

20       A      Yes.

21       Q      And are you in that photograph?

22       A      No.

23       Q      Is Mr. Cuthbert on the ground?

24       A      He is.

25       Q      And was Officer Johnson

60

1  standing behind him?

2       A     He is.

3       Q     Does he have his knee in his
4  back?

5       A     He has a his hands, his left
6  hand on his left shoulder and yes there is a
7  knee at his back.

8       Q     Was he cuffed?

9       A     He is.

10      Q     To the rear?

11      A     Yes.

12      Q     If you know how long was he in
13  that seated position before you transported
14  him?

15      A     That I don't recall.  That I
16  don't know how long it was.

17      Q     Can you describe with anymore
18  detail the truck that was at the
19  intersection parked behind my clients van?

20      A     The delivery, the oil delivery.

21      Q     What kind of truck was it, was
22  it an oil truck a cesspool truck?

23      A     Yes, it was something big.  It
24  was big.  It was a big delivery truck.

25      Q     Well do you know a person by

1       A       It was.

2       Q       It made a lot of noise?

3       A       Yes, sir.

4       Q       And you told him to stay around

5   because William Cuthbert was saying that you

6   hit him?

7       A       Absolutely.

8       Q       So you are saying now that

9   William Cuthbert did say that you hit him?

10      A       He was to claiming that I hit

11  him with my truck.

12      Q       All right.  Back up.

13      A       Okay.

14      Q       He made that claim the first

15  time that you walked over to him?

16      A       No he made that claim while he

17  was walking back to his vehicle to move it

18  out of the intersection.

19      Q       All right.  Hi made the claim,

20  lets get this straight.  You are in your

21  vehicle?

22      A       I am.

23      Q       And he's in the street, right?

24      A       Right.

25      Q       And you were attempting to

1   drive your vehicle around him over to

2   Acabonac Road.

3           A      Yes, I was getting him out of

4   the way.

5           Q      And he claimed right then and

6   there that you hit him?

7           A      He claimed it after he elbowed

8   the mirror.  Yes.

9           Q      Was he in the street when he

10  made that claim?

11          A      He was.

12          Q      And had he already parked his

13  van on Acabonac Way?

14          A      After the incident with me?

15          Q      I am not sure.

16                 THE COURT:   When have elbowed the

17          mirror he was still on Abrahams Path?

18          A      He was.  Yes, sir.

19          Q      And when he made the claim that

20  you had hit him he was on Abrahams Path?

21          A      Yes.

22          Q      And you turned around and had a

23  conversation with the driver of in the

24  delivery truck saying this guy is claiming

25  that I hit him?

1      A      Yes.  Because Mr. Cuthbert

2  continued to walk away.

3      Q      Are you done?

4      A      I am.

5      Q      So you knew before you pulled

6  over on Acabonac Road that he was claiming

7  that you hit him with your vehicle.

8      A      Yes, I did.  The accusation was

9  made.

10      Q      But you just said on direct and

11  cross examination that he never made that

12  indication?

13      A      No, he did.  He elbowed the

14  mirror.

15      Q      You just said over and over

16  again that he made the claim that you hit

17  him?

18      A      He made it once.  Once, that is

19  when he continued to walking to his vehicle

20  and that is when I turned to Mr. Brockwell

21  and said, don't go anywhere I need your

22  information and he said absolutely.

23      Q      Now when he made the claim that

24  you hit him you were in your vehicle?

25      A      I was.

1    Q    The driving side?

2    A    I was.

3    Q    He was in the street?

4    A    Um hum.

5    Q    And the driver of his vehicle

6 was in his vehicle?

7    A    Yes.

8    Q    When you had these

9 conversations with the truck driver you were

10 speaking over the sound of the diesel

11 engine?

12    A    Yes.

13    Q    And did of take a statement

14 from him?

15    A    I did not.

16    Q    Did anybody take a statement

17 from him?

18    A    No.

19    Q    So it was clear then, that Mr.

20 Cuthbert thought that you hit him, right?

21    A    Right.

22    Q    Before he pulled over the

23 vehicle on Acabonac Way?

24    A    Right.

25    Q    And it clear that he complied

1  with your commands to pull the vehicle from

2  the stop sign over to Acabonac Way?

3          A       Right.

4          Q       You mentioned traffic on direct

5  examination you but is it true you only

6  recorded that one truck behind his vehicle

7  when you first got there?

8          A       I recall the truck and the

9  numerous cars behind him before I proceeded

10  onto oncoming traffic, so there were a few.

11          Q       Is that anywhere in your notes

12  that there were numerous vehicles in that

13  intersection?

14          A       No, that I can recall no.

15          Q       Now you did say on direct

16  examination that when you wanted to put him

17  in the have vehicle for transportation that

18  you had to drag him over?

19          A       Yes.

20          Q       And prior to your dragging him

21  he was sitting in the snow and ice for quite

22  a long time, maybe a half hour?

23          A       I can't recall how long, but he

24  was sitting in the snow.

25          Q       So isn't it true that when you

1  went to pick him up he couldn't move his

2  legs?

3      A    I can't say that.  No to that

4  maybe people can walk.

5          MR. MACDONNELL:  Judge, I am going

6      to object.  Calls for speculation as

7      far as --

8          THE COURT:  I think the question

9      is did you know that the Defendant

10     couldn't move his legs.

11     A    I did not know, no.

12     Q    So when you picked him up with

13 Officer Johnson you didn't know whether or

14 not his legs were frozen?

15     A    No, I did not know no.

16     Q    All you knew was that he

17 couldn't walk?

18     A    Right, all I knew what that he

19 wasn't walking.

20     Q    So you didn't know why he

21 couldn't walk --

22         THE COURT:  He said wouldn't walk.

23     A    Right, I don't know why he

24 wouldn't walk.  He was asked to stand.  He

25 was escorted to the standing position and

1    then he was leaned forward and his toes were

2    being, his feet were dragged behind him.

3            Q     Could it have been that his

4    legs were frozen and he couldn't walk at the

5    time you wanted to transport him?

6                 MR. MACDONNELL:  Objection.

7                 THE COURT:  Sustained.  Calls for

8            speculation.

9            Q     Judge -

10                 Could it be that he couldn't

11   walk that day to transportation because his

12   both legs were frozen stiff?

13                 MR. MACDONNELL:  Objection.

14                 THE COURT:  Sustained.  Calls for

15           speculation.  He has already said he

16           didn't know why he would not walk.

17           Q     Back up.  So you don't know

18   whether he couldn't walk because he just

19   couldn't walk, you don't know.

20           A     Meaning prior.

21           Q     You don't know.  When you

22   wanted to transport him you don't know why

23   he couldn't walk?

24           A     I don't know.

25           Q     And it could be that he just

1    couldn't at that point?

2              MR. MACDONNELL:  Objection.

3              THE COURT:  It's like asking if

4         it's possible which anything is

5         possible.  The Officer had made it

6         clear, he does not know.

7              MR. GIANNINI:  I know.

8         Q     Now you testified on direct

9    examination that you put him the back of a

10   police car for transportation?

11        A     Yes, sir.

12        Q     And did you say that his feet

13   were sticking out of the car?

14        A     Yes, sir.

15        Q     And did you say on direct

16   examination that you took a strap and tied

17   it around his ankles and tied around his

18   arms?

19        A     It was tied around his ankles

20   and clipped to the handcuffs, yes.

21        Q     Do you call that being hog

22   tied?

23        A     I would call that restraining.

24        Q     Would a lay person call that

25   being hog tied?

1          A      Maybe sir.  Yes, sir.

2          Q      Well you are laughing at that?

3          A      Well I call it a leg restraint.

4          Q      It's funny huh?

5          A      Nothing is funny but, it's a

6   figure of speech?

7               MR. GIANNINI:  I have no further

8          questions.

9               THE COURT:  Very good.  Any

10          redirect.

11               MR. MACDONNELL:  Just briefly,

12          Your Honor.

13   REDIRECT EXAMINATION

14   BY MR. MACDONNELL:

15          Q      Officer, do you recall what

16   time you arrived at the scene or what time

17   the 911 call came across dispatch?

18          A      I think it was around 10:26,

19   10:30.

20          Q      And the time of arrests was

21   around what time?

22          A      10:56.

23          Q      So in total thirty minutes

24   between when you were dispatched and when

25   the Defendant was placed in the vehicle for

1   arrest?

2         A     Yes, sir.

3         Q     And that includes the time for

4   you to drive from where you were to the

5   intersection where the accident occurred.

6   Had the interaction with the Defendant and

7   then the harassment, disorderly conduct and

8   resisting arrest come after that?

9         A     Yes.

10        Q     And you also stated earlier

11  that when you were driving in oncoming

12  traffic you saw the Defendant outside of the

13  vehicle having a conversation with Mr.

14  Brockway in the truck?

15        A     Yes.

16        Q     Do you recall what was being

17  said at that point?

18        A     Not until I pulled up next to

19  him.

20        Q     When you pulled up next to him

21  what did you hear the Defendant say?

22        A     I presented myself as the

23  police, could you please move your car.  "I

24  am waiting for the fucking cops."  And that

25  is when he turned around.  Then I said, just

1   move your truck so it doesn't get hit and he

2   turn around and said to the driver of the

3   truck, "Do you have a fucking problem too?"

4           MR. GIANNINI:   Objection.

5       Withdrawn.

6       Q   And he said that to the driver

7   of the other vehicle?

8       A   The driver of the delivery

9   truck.

10      Q   The window was down on that

11  truck?

12      A   It was.

13      Q   Now your also asked in cross

14  examination about the handcuffs with regard

15  to placing them behind the back of the

16  Defendant?

17      A   Yes.

18      Q   Why do you place the

19  Defendant's hands behind the back of the

20  Defendant?

21      A   That is the routine for being

22  in charge, you put the handcuffs behind the

23  back.  It's for safety of the Officer.

24      Q   And you also stated on direct

25  the arrest regarding keeping the Defendant

1 outside of the vehicles and sitting on the

2 curb.  Why was the Defendant not placed in

3 any of the vehicles that were at the scene?

4        A      There was no room in any of the

5 vehicles that were at the scene and I don't

6 place people who are under arrest in the

7 drivers seat of any car.

8        MR. MACDONNELL:  Thank you, Your

9        Honor.  No further questions at this

10       time.

11       THE COURT:  Recross examination.

12 RECROSS EXAMINATION

13 BY MR. GIANNINI:

14       Q      You just said in your redirect

15 examination that there was no room in your

16 vehicle for him?

17       A      Right, there was no room.

18       Q      What about Officer Johnson's

19 vehicle?

20       A      He was also in a SUV four-wheel

21 drive vehicle.

22       Q      What about Officer Rantinelli?

23       A      We were all in SUV's at that

24 time.  We were told by the Sargent to occupy

25 an SUV.  The roadways might have been

1   cleared but the driveways and side streets

2   were still full of snow?

3        Q    If you know, how long did it

4   take from the time you placed him under

5   arrest until transportation arrived?

6        A    I don't know how long I was

7   there it felt like a couple of minutes.

8        Q    And what was the name of the

9   Officer that actually transported him to

10  headquarters?

11       A    Officer Thomas Strong.

12       Q    And just before you were about

13  to arrest him did you ever say to him, you

14  have a bad attitude?

15            MR. MACDONNELL:  Objection, Your

16       Honor.

17            THE COURT:  Sustained.  It's not

18       part of the direct or cross

19       examination, or redirect.

20            MR. GIANNINI:  I have no further

21       questions.

22            THE COURT:  Yes.  Very good.

23       Anything else.

24            MR. MACDONNELL:  Nothing further.

25            THE COURT:  Officer Trotta, you

1      are excused.

2              THE WITNESS:  Thank you, sir.

3              THE COURT:  Thank you.  We will

4      take a ten minute break.  See you back

5      at 2:20 p.m., with another witness.

6

7         (Whereupon, a recess was taken.)

8

9

10              *           *           *

11    The foregoing minutes are hereby certified to be a true
      and accurate transcript of the proceedings herein.

12

13    _____

14        Gloria P. Rosante, Court Reporter

15

16

17

18

19

20

21

22

23

24

25